NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

:
DICAR, INC., and ROBUD,                          :
:
      Plaintiffs,                              :     **Hon. Dennis M. Cavanaugh**
:
      v.                                       :         **OPINION**
:
STAFFORD CORRUGATED PRODUCTS,:    Civil Action No. 2:05-cv-5426 (DMC)(MF)
INC., and RODICUT ROTARY:
DIECUTTING,                                      :
:
      Defendants.                              :

---

DENNIS M. CAVANAUGH, U.S.D.J.:

      This matter comes before the Court upon motions of Plaintiffs Dicar, Inc. and Robud ("Plaintiffs"). Plaintiffs move to dismiss Counts Two and Three of the Amended Counterclaims of Defendants Stafford Corrugated Products, Inc. and Rodicut Rotary Diecutting ("Defendants") for failure to state a claim upon which relief can be granted, pursuant to FED. R. CIV. P. 12(b)(6). Plaintiffs also move for reconsideration of a portion of this Court's June 22, 2009 Opinion, wherein Plaintiffs' Motion to Dismiss Defendant's First Counterclaim and Second and Third Affirmative Defenses was denied. A hearing was held on March 2, 2010. Prior to addressing Plaintiffs' motions, however, the Court must construe a term contained in claim 13 of U.S. Patent No. 5,720,212 (hereinafter "the '212 patent").

      After carefully considering the written and oral arguments of the parties, and based upon the following, it is the finding of this Court that Plaintiffs' Motion to dismiss Counts Two and Three of Defendants' Amended Counterclaims is **granted** (see Section III), Plaintiffs' motion for

Reconsideration is **granted** (Section IV), and the disputed term of claim 13 is construed as set forth below (Section II).

I.     **BACKGROUND**[1]

    A.    **PROCEDURAL HISTORY**

Plaintiff Dicar is in the business of manufacturing and selling products for use in the rotary die cutting industry. One such product is the die cutter blanket. Plaintiff Robud is the owner of patents related to the die cutter blanket. Robud has sold an exclusive license to Dicar to manufacture the die cutter blanket. Defendants Stafford and Rodicut are also in the rotary die cutting industry. Stafford sells and imports a die cutter blanket manufactured by Rodicut.

In 1997, Robud prosecuted a patent application that eventually became the '212 Patent entitled "Locking Arrangement For Die Cutter Blanket." On April 15, 1997, during prosecution of the '212 patent, the patent examiner rejected claim 18 of the patent application. Robud, in claim 18, described a discrete portion of the locking arrangement as a "locking member including a compressible means." On April 25, 1997, in response to the rejection, Robud amended the language of claim 18 to read: "a locking member and compressible means coupled to the locking member." After Robud's amendment, the patent examiner approved claim 18 (which later became claim 13 of the patent). On February 24, 1998, the United States Patent and Trademark Office ("USPTO") issued the '212 patent.

On November 16, 2005, Plaintiffs commenced an action alleging infringement of the '212 patent against Stafford. After proceeding through discovery for approximately two years, Plaintiffs moved on November 28, 2007 for summary judgment on their '212 patent infringement claim. At

---

[1]The facts set forth in this Opinion are taken from the parties' moving papers.

the Court's instruction, and after Plaintiffs withdrew their motion, both parties filed amended pleadings. Discovery continued until May 5, 2008, at which time Plaintiffs filed an Amended Complaint and added Rodicut as a Defendant. Defendants Stafford and Rodicut filed their Answer and Counterclaims on July 3, 2008.

Stafford and Rodicut's counterclaims consist of: (1) declaratory judgment of non-infringement, invalidity and unenforceability of the '212 patent; (2) violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; (3) violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; and (4) violation of New Jersey Antitrust laws, N.J. Stat. §§ 56:9-1 *et seq*. Stafford and Rodicut also assert the following affirmative defenses: (1) laches and estoppel; (2) invalidity and unenforceability of the '212 patent; (3) inequitable conduct before the USPTO; and (4) unclean hands as a result of Plaintiffs' impermissible broadening of the scope of the '212 patent.

On November 3, 2008, Dicar and Robud filed a motion to dismiss the counterclaims and strike the affirmative defenses. On June 22, 2009, the Court dismissed the antitrust counterclaims, and permitted Defendants to replead. In the same Opinion, the Court denied Plaintiffs' motion to dismiss Defendants' First Counterclaim and Second and Third Affirmative Defenses (relating to inequitable conduct). Defendants subsequently replead, and Plaintiffs moved to dismiss the claims on September 4, 2009.

### B. DIE CUTTER BLANKETS

A continuous sheet of material, such as corrugated paperboard, can be cut to a desired shape and size using a machine called a rotary die cutter. Once cut, the paperboard can be folded into, for example, cardboard boxes. A typical way to cut the corrugated paperboard is by passing it between a cutting roller and an anvil (i.e., a cylindrical drum). Cutting blades, which are commonly called

dies, are attached to, and rotate along with, the cutting roller.  Eight to twelve die cutter blankets are wrapped around the length of the anvil.  The spacing between the cutting roller and the anvil is set so that the cutting blades penetrate the surface of the die cutter blanket—this ensures that the blades completely cut through the corrugated paperboard. If the blanket was formed from a material that was too hard, the blades would quickly become dull since the blades are positioned to cut into the blanket.  If, on the other hand, the blanket was too soft or spongy, the corrugated paperboard could move while being cut and thereby cause either incomplete or improper cutting of the paperboard. Accordingly, the die cutter blanket needs to be constructed of a deformable material that is sufficiently rigid to give adequate support to the paperboard, yet soft enough so that the cutting blades will not wear or be damaged when they impact the blanket.  The material that has been favored in the industry for fabricating blankets is polyurethane.  Polyurethane blankets are fabricated by pouring liquid polyurethane into a mold that is designed to produce a blanket of the desired dimensions. The polyurethane cools, shrinks, and hardens to form the blanket.

The penetration of the cutting blades into the blankets causes more wear in some areas than others.  The life of the blankets can be extended by rotating them on the anvil so that the dies' impact is distributed to various locations of the blankets.  Even with periodic rotations of the blankets, after a few rotations the blankets need to be replaced.  The rotation and replacement requires stopping production.  This is of particular concern because, in the rotary die cutting field, the machines normally operate at relatively high speeds, thereby generating enormous output with relatively small labor requirements. Any work stoppages or added labor can be very costly.

A problem that has received attention over the years is the mechanism that attaches (*i.e.*, locks) the blanket to the anvil. Before the invention disclosed in the '212 patent, the typical way to

attach the blanket to the anvil was through the use of bolts. To accommodate the bolts, a slot (often called a channel) with threaded holes is formed in the anvil. These holes accept bolts that are inserted through the blanket. The time and labor required by bolting and unbolting the blankets caused the machine to be out of service for an hour or more.

Another method of attachment was to design the ends of the blanket to interlock with one another. In this design, one end of the blanket is physically held in place in the anvil's channel while attempting to wrap the other end around the anvil. The interlocking ends are then pushed together. A problem with this design is that the end of the blanket may pop out of the channel while the other end is being wrapped around the anvil.

### C.        THE '212 PATENT

The '212 patent discloses a unique design for a die cutter blanket. In the claimed blanket, one end contains a projection that is designed to deform/compress when it is inserted into a channel in the anvil. The compression of the projection causes enough friction so as to retain the end of the blanket within the channel, and prevent the blanket from sliding along the anvil while the machine is operating. Figure 1 of the '212 patent, which is reproduced below, discloses one embodiment of the invention. In the Figure the anvil is labeled with the number 6 and its channel is labeled with the number 8. Here, a locking mechanism, which is called a "composite structure" in the '212 patent, is formed of two components (i.e., a "member" and an "element," which are labeled with the numbers 30 and 46, respectively). Figure 1 of the '212 patent shows the composite structure partially inserted into the anvil's channel.

-5-



As depicted in Figure 2 of the '212 patent, shown above, although the composite structure (30 and 46) is wider than channel (8), the structure can be fully inserted in the channel. This occurs because element (46) is made from a compressible material. The compression of element (46) forces the composite structure (30 and 46) to become tightly engaged (i.e., locked) within the channel when inserted. Once the first end (22) is locked to the anvil, the second end (24) can be wrapped around the anvil.

Figure 10 of the '212 patent, which is reproduced below, discloses another embodiment of the invention. Here, the composite structure is formed from one piece of material—in fact, the entire blanket (130) is formed from one piece of material. Thus, in this embodiment, the locking mechanism that projects from one end of the blanket (136) is formed from one single piece of material.



## II.    <u>CLAIM CONSTRUCTION</u>

Prior to considering Plaintiff's motion to dismiss and motion for reconsideration, the Court will construe a disputed term in the '212 patent.  The term, contained in claim 13 (previously claim 18 during prosecution), is: "compressible means coupled to the locking member."  The claim containing the disputed term is provide in Section II.B, <u>infra</u>.

### A.    APPLICABLE LAW

Claim construction is a matter of law to be determined solely by the court.  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005), <u>cert. denied</u>, 546 U.S. 1170 (2006).  Analysis of a patent infringement claim is a two-step process.  <u>Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.</u>, 279 F.3d 1357, 1365 (Fed. Cir. 2002).  A court must first construe the meaning and scope of the patent claims, <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996), and then compare the claims as construed to the alleged infringing product.  <u>Tate</u>, 279 F.3d at 1365.  At this stage, the Court will only engage in the first step.  To construe the terms of a patent, a court should look first to the language of the claim itself.

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Terms within a claim "are generally given their ordinary and customary meaning."  Id.  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips, 415 F.3d at 1313.

To determine how a person of skill in the art would understand a patent's claim language, a court must first examine the intrinsic record—the patent itself, including the claims, the specification and the prosecution history.  Vitronics, 90 F.3d at 1582 (citing Markman, 52 F.3d at 979).  The specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."  Id.  Indeed, the Federal Circuit has explained that the specification is "usually . . . dispositive . . .[and is the] best guide to the meaning of a disputed term."  Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582)(internal quotations omitted).  It is proper for a court to "rely heavily on the written description for guidance as to the meaning of the claims."  Id. at 1317.

A patent's prosecution history is also a critical source of guidance, as it "provides evidence of how the PTO and the inventor understood the patent."  Id.  The prosecution history is the complete record of the proceedings before the PTO, and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.  The Federal Circuit has repeatedly emphasized the need to consult the prosecution history to "exclude any interpretation that was disclaimed during prosecution."  See Rhodia Chimie v. PPG Indus., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (recognizing that, in exchanges with the PTO, a patent

-8-

applicant may disavow or disclaim certain claim coverage, thereby precluding any claim interpretation that would encompass the disavowed or disclaimed subject matter).

After consulting intrinsic evidence, a district court may also examine extrinsic evidence—i.e., "all evidence external to the patent and prosecution history." Markman, 52 F.3d at 980; Phillips, 415 F.3d at 1317-18 (stating that the Federal Circuit "ha[s] authorized district courts to rely on extrinsic evidence"). Such evidence consists of testimony by the inventor or by experts, dictionaries, and treatises. Markman, 52 F.3d at 980. However, extrinsic evidence is generally "less significant than the intrinsic record in determining the legally operative meaning of claim language." C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (quotations omitted). Extrinsic evidence, when relied upon, must be considered in view of the specification and prosecution history. Phillips, 415 F.3d at 1320. ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence.")

**B.    THE DISPUTED TERM**

The '212 patent is titled "Locking arrangement for die cutter blanket." The '212 patent contains 20 claims, dependant and independent. Claim 13 of the patent recites:

> A blanket for mounting on a cylindrical anvil means rotatable about an axis, the anvil means having a channel in a surface thereof extending substantially parallel to said axis, said channel having opposing side walls, said blanket comprising:
>
> a flexible strip having first and second ends, said flexible strip for wrapping about the anvil means such that the ends are adjacent to each other;
>
> a locking member connected to the first end for insertion into said channel and for locking said first end to said anvil means;
>
> **compressible means coupled to the locking member**, said locking member and compressible means for compressive interference engagement with and between said channel side walls for locking the locking member and said first end of the strip to the

anvil means in compressive interference friction engagement with the channel side walls; and

interlock means for locking said ends together.

The parties disagree as to the meaning of the highlighted term.  Specifically, they dispute the meaning of the term "coupled."

### C.   ANALYSIS

Plaintiffs assert that, in accordance with claim 13, the compressible means can be "coupled" to the locking member by either: (a) fabricating the compressible means and the locking member together from the same material so that they are permanently joined to each other, **or** (b) fabricating the compressible means and the locking member separately and thereafter joining them together. Defendants assert that only the latter definition is a correct construction of the claim.  That is, Defendants argue that for the compressible means to be "coupled" to the locking member, they must be fabricated separately and then joined together.

To determine the proper construction of the disputed term, the Court will consider the intrinsic evidence, the (1) claims/specification and (2) the prosecution history of the '212 patent, Vitronics, 90 F.3d at 1582 (citing Markman, 52 F.3d at 979), as well as (3) relevant extrinsic evidence, e.g., dictionaries and treatises.  Phillips, 415 F.3d at 1320.

### 1.   The Claims/Specification of the '212 Patent

As the Federal Circuit has explained, the patent specification is "the single best guide to the meaning of a disputed term," and that claims should be "construed so as to be consistent with the specification."  Accordingly, the Court will begin its analysis with the specification.  Id. at 1315-16.

The term "coupled" is used in the patent's specification to mean "attached."  Based on the

usage of the term throughout the patent specification, this Court finds that the term need not refer to the attachment of two separately manufactured elements.  The Court finds that "coupled," here, can refer to the attachment of two elements of a single structure.  Three specific instances with the patent support such a construction.

First, the specification, in one instance, explains that "interlock means [are] **coupled** to the first and second ends for locking the ends together."  See '212 Patent, at col. 2, lines 49-50 (emphasis added).  The "interlock  means" are the male and female interlocking portions depicted in many of the figures contained in the patent.  See, e.g., Figs. 1, 2, 10, supra.  In Figure 1, for example, the interlock means are the ends of the blanket themselves—i.e., the portion of Figure 1 that is cross-hatched with heavy stripes.[2]  As the Figure illustrates, the interlock means are formed from the same structural element as the blanket.  Indeed, the specification describes the female interlocking member as "a molded integral homogenous one piece depending member."  Id. at col. 4, lines 35-38.  Despite the fact that the female interlock portion is "integral" to the blanket portion, in describing the interlock portion, the specification states that the means are "coupled" to the first and second ends of the blanket.  Accordingly, the specification uses the term "couple" to mean attached–even where the two "coupled" elements are not structurally distinct units.  See Phillips, 415 F.3d at 1314 (observing that "the usage of a term in one claim can often illuminate the meaning of the same term in other claims").

Second, the term "coupled" is utilized in the same way in claim 17.  In claim 17, the patent claims interlock means that are, again, integrally-molded to the ends of the blanket.  The claim

_____

[2] In Figure 1, the male and female portion of the interlocking means are labeled as (24) and (42), respectively.

recites "interlock means **coupled** to the first and second ends for locking said ends together." Id. at col. 10, lines 46-47 (emphasis added).  This confirms the Court's previous discussion regarding the term "coupled" in the '212 patent specification.  The specification, then, uses the term couple to mean attached, and does not impart a requirement that the attached portions be structurally separate (i.e., manufactured separately and then attached to each other).

Third, the Court notes that the "interlock means" are depicted in the patent as part of the blanket structure (i.e., attached to the ends of the blanket).  See '212 patent, at Fig. 10.  If possible, the Court should construe the term "coupled" in a manner which would not exclude examples in the specification.  See Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295,1305 (Fed. Cir. 2007) (construing terms in a manner that does not exclude examples in the specification); Oatley Co. V. IPS Corp., 514 F.3d 1271, 1277 (Fed. Cir. 2008) (same).  Accordingly, the Figure supports the Court's construction.

In construing the term "coupled," the Court must utilize a definition that is broad enough to cover all uses of the term "coupled" within the patent.  See Acromed Corp. v. Sofamor Danek Group, Inc., 253 F.3d 1371, 1381-82 (Fed. Cir. 2001) ("These three uses of the term require a meaning broad enough to apply to each of these [uses].").  The Court finds that the '212 patent's claims and specification indicate that the "compressible means" need not be structurally separate from the locking member in order for the two elements to be accurately described as "coupled."

2. The Prosecution History

Defendants assert that the prosecution history supports their assertion that the term "coupled" in claim 13 indicates that the "compressible means" and the locking member must be structurally distinct elements.  The Court does not agree.

-12-

On September 27, 1996, claim 13 of the '212 patent (appearing in the patent application as claim 18)[3] read as follows:

> A blanket for mounting on a cylindrical anvil means rotatable about an axis, the anvil means having a channel in a surface thereof extending substantially parallel to said axis, said blanket comprising:
>
> a flexible strip having first and second ends, said flexible strip for wrapping about the anvil means such that the ends are adjacent;
>
> a locking member connected to the first end for insertion into said channel and for locking said first end to said anvil means;
>
> **said [locking] member including compressible means** for compressive interference engagement with said channel for locking the locking member and said first end of the strip to the anvil means in said compressive interference friction engagement with the anvil means; and
>
> interlock means for locking said ends together.

The claim was amended in response to the examiner's rejection. The relevant portion of the amended claim, reads:

> **compressible means coupled to the locking member**, said locking member and compressible means for compressive interference engagement with and between said channel side walls for locking the locking member and said first end of the strip to the anvil means in compressive interference friction engagement with the channel side walls; . . .

Defendants argue that this modification shows that the compressible means must, post-modification, be separate structures which are then attached to each other. The Court cannot agree.

The examiner made the rejection under 35 U.S.C. § 112. This provision explains that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." This rejection, then, was for a lack

---

[3] The claim herein referred to as claim 13 was previously claim 18. Prior to several modifications, the patent contained additional claims that were subsequently removed.

of clarity in the claim language rejection under § 112 (in contrast to a rejection under § 103, where an applicant might modify the claim language to distinguish the invention from the prior art).[4] Accordingly, the Court will not find that the applicants were intentionally limiting their claim.

Moreover, with respect to the prosecution history, the Court notes that an alleged statement or modification must strictly demonstrate the applicant's intent to limit the claim to have such effect: "[T]he alleged disavowing actions or statements … must be both clear and unmistakeable." Omega Eng'g v. Raytek Corp., 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). A statement that is vague or ambiguous as to whether the applicant intended to limit his or her claim will not give rise to a disclaimer of claim scope. Id. at 1324-25. Here, the Court cannot find an unambiguous intention to limit the scope of the claim.

The prosecution history of the '212 patent's does not indicate that the "compressible means" must be structurally separate from the locking member in order to be "coupled" to each other.

3. Lexicographical Sources

As to the extrinsic evidence, Defendant provides a number of citations to dictionaries and scientific treatises. Regarding the verb "couple," the sources generally indicate that the word means to connect, link, join, or associate two things. Here, the "locking member" and the "compressible means" can be considered connected, linked, joined or associated, regardless of whether they are two separate structures or are one physical structure (comprised of two elements). See Cannon Rubber

---

[4] The examiner's focus during examination of claims for compliance with the requirement for definiteness of 35 U.S.C. 112, second paragraph, is whether the claim meets the threshold requirements of clarity and precision. Manual of Patent Examining Procedure § 2173.02. In responding to an obvious rejection under 35 U.S.C. 103, an applicant would amend his claims and argue against the references that form the basis for the rejection. See, e.g., Unique Concepts, Inc. v. Brown, 939 F.2d 1558 (Fed. Cir. 1991). Frequently, this would consist of narrowing the claim to distinguish over the prior art. See, e.g., id.

Ltd. v. First Years, Inc., 163 Fed. Appx. 870, 877 (Fed. Cir. 2005) ("[T]he court's construction of those limitations requires that both be embodied by the same single structure,. . . [; t]ellingly, TFY does not cite any case law prohibiting a claim from reciting two limitations embodied by the same structural component"); Intellectual Property Development, Inc. v. UAColumbia Cablevision, 336 F.3d 1308, 1320 n. 9 (Fed. Cir. 2003)  (noting that two limitations hypothetically can read on the same structure) (citing In re Kelley, 305 F.2d 909, 915-16 (C.C.P.A. 1962)).

The extrinsic evidence is, at best, ambiguous as to whether the verb "couple" requires a connection of two structurally distinct elements.

\* \* \* \* \*

Having considered the intrinsic  and extrinsic evidence, the Court finds that the '212 patent uses the term "coupled" to mean the attachment of two elements, that (1) are separately manufactured and then attached **or** (2) are both part of a single structural unit.[5]  Accordingly, claim 13 of the '212 patent includes within its scope locking members and compressible means that are formed together at the same time from the same material, as well as locking members and compressible means that are formed separately and later mechanically/physically joined together

## III.    PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' ANTITRUST COUNTERCLAIMS FOR FAILURE TO STATE A CLAIM

As noted above, Plaintiffs brought this suit alleging infringement of the '212 patent.  In response, Defendants asserted a number of counterclaims, including:  (1) declaratory judgment of

---

[5] As discussed above, the Court found the specification to be the most instructive source in defining the term.  See Phillips, 415 F.3d at 1314-16 (explaining that terms within a patent "must be read in view of the specification [(i.e., the written description of the invention, its embodiments, and the drawings)], of which they are a part.").  As such, the specification and the other claims in the patent were relied upon to arrive as the construction set forth above.

invalidity of the '212 patent based upon inequitable conduct before the U.S. Patent and Trademark Office ("PTO"); (2) violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; and (3) violation of New Jersey Antitrust laws, N.J. Stat. §§ 56:9-1, *et seq.*[6]

Plaintiffs move to dismiss Defendants' Second and Third counterclaims (i.e., the antitrust counterclaims). Plaintiffs previously moved to dismiss counterclaims two and three for failure to state a claim. On June 22, 2009, the Court dismissed Defendants' counterclaims pursuant to FED. R. CIV. P. 12(b)(6). Defendants, however, were permitted to replead. The Court will now consider Plaintiffs' motion to dismiss Defendants' antitrust counterclaims in light of the Amended Complaint.[7]

### A.  Standard of Review

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See Warth v. Seldin, 422 U.S. 490, 501 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure

---

[6] Plaintiff moved to dismiss Defendants' first Counterclaim, and this motion was denied on June 22, 2009. Plaintiff requests reconsideration of this motion, which the Court will address in Section IV, infra.

[7] The Court will consider Plaintiffs' motion to dismiss Defendants' federal and state antitrust claims together. The New Jersey Antitrust Act was "patterned after the Sherman Act, and [courts] have previously acknowledged the significance of federal antitrust decisions in the interpretation of our State antitrust law." Monmouth Chrysler-Plymouth, Inc. v. Chrysler Corp., 102 N.J. 485, 494 (1986); Cosmetic Gallery, Inc. v. Schoeneman Corp., 495 F.3d 46, 50-51 (3d Cir. 2007). Indeed, the Act itself requires that it be construed in harmony with federal antitrust laws. See N.J.S.A. § 56:9-18.

to state a claim.  Hishon v. King & Spalding, 467 U.S. 69, 73 ( 1984).  In Bell Atlantic Corp. v. Twombly the Supreme Court clarified the Rule 12(b)(6) standard.  ___ U.S. ___, 127 S.Ct. 1955 (2007).  Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  Twombly, at 1968 (citing Conley, 355 U.S. at 45-46).  Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id. at 1965.  Ultimately, the question is whether the claimant can prove a set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

Although the 12(b)(6) pleading requirements are liberal, facts must be pleaded with reasonable particularity in order to permit an inference that an antitrust claim is cognizable.  See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 n.17 (1983) (in an antitrust case, "a district court must retain the power to insist upon some specificity in the pleading before allowing a potentially massive factual controversy to proceed"); Commonwealth of Pennsylvania ex. Rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 179 (3d Cir. 1988) ("'It is not … proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.'") (quoting Associated General, 459 U.S. at 526 n.11).

### B.  Applicable Law

A claim for monopolization/attempted monopolization under Section 2 of the Sherman Act requires allegations "(1) that the defendant has engaged in predatory or anticompetitive conduct with

(2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market.  Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993).  Accordingly, to determine whether a claim of monopolization or attempted monopolization exists, an inquiry "into the relevant product and geographic market" is required.  Id. at 459; see Schuykill Energy Resources, 113 F.3d at 415; Ideal Dairy Farms, 90 F.3d at 750.  An antitrust plaintiff, then, must plead "facts sufficient to demonstrate a viable relevant market."  Syncsort Inc. v. Sequential Software, Inc., 50 F.Supp.2d 318, 327 (D.N.J. 1999) (citations omitted), so that the effects of the allegedly anticompetitive conduct can be measured.  See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 29 (1984); U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 994 (11th Cir. 1993).  A plaintiff bears the burden of defining the relevant market, see Brokerage Concepts, 140 F.3d at 513; Queen City Pizza, 124 F.3d at 436; Pastore, 24 F.3d at 512; Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir.), cert. denied, 505 U.S. 1221 (1992), which is comprised of a relevant product market and a relevant geographic market.  See Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962).  Both markets must be defined in the pleadings.  Syncsort, 50 F.Supp.2d at 327

Once a relevant market is properly established, a plaintiff must plead facts indicating that there is a dangerous probability that the defendants will achieve monopoly power in the relevant market.  Spectrum, 506 U.S. at 456.  To determine whether there is a dangerous probability of achieving monopoly power, a court considers the Barr Labs factors: the size of the defendant's "market share" as well as "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992).

In addition to the elements of an antitrust claim discussed above, a plaintiff must make a threshold showing of "antitrust injury." <u>Trans World Techs., Inc. v. Raytheon Co.</u>, 2007 U.S. Dist. LEXIS 82118, at *13-15 (D.N.J. November 1, 2007); <u>Tunis Bros.</u>, 952 F.2d at 728 ("[T]he plaintiffs must have demonstrated some harm to the competitive landscape from Ford Motor's termination of the Tunis Brothers franchise.").

**C. Analysis**

Plaintiffs assert that Defendants' antitrust counterclaims must be dismissed for failure to state a claim. Specifically, Plaintiffs assert that Defendants failed to adequately plead (1) the definition of the relevant geographic market, (2) the basis for inferring that there is a dangerous probability of achieving monopoly power in said market, and (3) antitrust injury. Defendants respond that their Amended Complaint now satisfies the pleading requirement of 12(b)(6).

For the reasons stated below, Plaintiffs' motion to dismiss Defendants' antitrust counterclaims is granted.[8]

### 1. Definition of a Relevant Geographic Market

To prevail on its antitrust claim, Defendants must established that "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market. <u>Spectrum Sports</u>, 506 U.S. at 456. Defendants have defined the relevant product market as covering "die cutter blankets for rotary die-cutting machines." Amended Counterclaim ("Am. Counterclaim") ¶ 13.

---

[8] The Court has determined that Defendants failed to adequately plead (1) the definition of the relevant geographic market, and (2) the basis for inferring that there is a dangerous probability of achieving monopoly power in said market. <u>See</u> Sections III.C(1)-(2), <u>infra</u>. Accordingly, the Court need not assess Plaintiffs' argument regarding Defendants' alleged failure to plead antitrust injury.

Defendants assert that they have properly plead the relevant market, as they must. With respect to the relevant product market, they contend that "[t]here are no reasonably interchangeable products for the die cutter blankets, [and t]herefore, there is no cross-elasticity of demand as there is no other product that a purchaser can buy if the price of the rotary die cutter blanket increases." Id. With respect to the geographic market, Defendants explain that "[t]he geographic market is the United States, as that is the geographic scope of the alleged patent protection asserted by Plaintiffs Robud and Dicar." Id.

To determine the bounds of a relevant geographic market, elasticity is the paramount consideration. In other words, the question is "how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location." Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d Cir. 2006). Defendants must plead the geographic market. Cf. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997) (requiring dismissal where a plaintiff fails to plead cross elasticity of demand). Here, Defendant has failed to do so.

Defendants assert that the relevant geographic market is the United States. They argue that the market is restricted to the U.S. because that is the area wherein Plaintiffs can assert patent protection over their die cutter blanket product. This market definition focuses impermissibly on the specific geographic market in which **Plaintiffs** (i.e., manufactures) conduct their business[9]–as

_____

[9] For example, Defendants assert that their "designation of the relevant geographic market as the United States" is proper because "the unfair actions taken by Dicar, and the impact of those actions on competitors, stem from Dicar's unlawful and bad-faith assertion of two United States Patents." See Defendants' Brief in Opposition to Plaintiffs' Motion to Dismiss ("Def. Opp."), at 9.

opposed to the geographic market that **consumers** would be willing to access to purchase die cutter blankets.  See Borough of Lansdale v. Philadelphia Elec. Co., 692 F.2d 307, 311-13 (3d Cir. 1982) (rejecting plaintiff's argument that, as a matter of law, the geographic market was defendant utility's service area to the exclusion of nearby utility companies); Tunis Bros. Co. v. Ford Motor Co., Inc., 952 F.2d 715, 726 (3d Cir. 1991) ("Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product.").  Defendants have not focused on the elasticity of demand (i.e., consumer behavior), and therefore have not adequately plead a geographic market.

Moreover, the Court is unaware of any circumstances that limit consumers to the U.S. market.  As both parties acknowledge, "numerous other entities compete in the international market."  Am. Counterclaim ¶ 25; see Brief in Support of Plaintiffs' Motion to Dismiss ("Pl. Br.") at 10.  Where, as here, there is no indication that a consumer would be unable to purchase a product abroad, the Court will not arbitrarily limit the geographical market to the U.S.  See E&E Co., Ltd. v. Kam Hing Enterprises, Inc., 2008 U.S. Dist. LEXIS 65323, at *8 (N.D. Cal. August 25, 2008) (dismissing a plaintiff's antitrust claims because the "plaintiff fail[ed] to indicate why similar bed coverings originating from other countries would not be reasonably interchangeable by consumers for the same purposes").  Defendants have asserted that there are barriers to entry into the U.S. market.  However, the Court has not been apprised of any facts indicating that it would be cost-prohibitive to have goods sold/shipped to the U.S.  In fact, it appears that a foreign distributor (Max Dura) has in fact established a small presence in the U.S. market.[10]  In any case, a mere assertion that

---

[10] The fact that Max Dura has not gained a significant share of the market does not alone demonstrate that there are barriers to entry–the fact that it has a U.S. presence indicates the opposite.  See Korkala v. Allpro Imaging, Inc., 2009 U.S. Dist. LEXIS 70727, *16-17 (D.N.J.

market access is restricted, without more, is insufficient to withstanding a motion to dismiss.  See St. Clair v. Citizens Fin. Group, 2009 U.S. App. LEXIS 16465, *8-9 (3d Cir. July 23, 2009) (finding that plaintiff's allegation that the defendants "effectively barricaded entry into the market," was too conclusory to be sufficient under Twombly).

For the reasons stated, the Court cannot find that Defendants' pleadings sufficiently delineate the geographic market.  See Bansavich v. McLane Co., 2008 U.S. Dist. LEXIS 89071, at *7 (D. Conn. Oct. 31, 2008) ("Thus, dismissal is appropriate . . . [where] a plaintiff has failed to provide a plausible explanation as to why a market should be limited in a particular way."); Brown Shoe Co. v. United States, 370 U.S. at 324; Syncsort, 50 F.Supp.2d at 327.  As such, Plaintiffs' motion to dismiss Defendants' Sherman Act counterclaim must be dismissed for failure to state a claim.

2.  A Dangerous Probability of Achieving Monopoly Power in the Relevant Market

Even if the Court found that the relevant geographical market for die cutter blankets is the United States, as Defendants' contend, Defendants must also plead facts suggesting that there is a dangerous probability that Plaintiffs will achieve monopoly power in said market.[11]  To assess whether such a probability exists, a court considers the Barr Labs factors: (1) the size of the defendants' market share (2) the strength of competition, (3) probable development of the industry,

_____

August 12, 2009) (unpublished) ("Korkala has not set forth facts sufficient to demonstrate that the Scanx System is unique. In fact, Korkala has inconsistently provided that Logos Imaging, LLC, FUJI NDT…are all companies that manufacture products in 'competition' with the Scanx System.")

[11] To prevail on its antitrust claim, Defendants must established that "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market.  Spectrum Sports, 506 U.S. at 456; see Dicar, Inc. v. Stafford Corrugated Prods., 2009 U.S. Dist. LEXIS 52245, at *21-22 (D.N.J. June 22, 2009).  The dispute, here, is with respect to the third element.  See id.

(4) the barriers to entry, (5) the nature of the anticompetitive conduct, and (6) the elasticity of consumer demand.  See 978 F.2d at 112.

Defendants plead facts as to the first factor.  They emphasize, significantly, that Plaintiffs' control a 70% share of the relevant market.  Beyond this allegation, however, Defendants' pleadings are conclusory.  As this Court explained in its previous dismissal of Defendants' antitrust counterclaims, market share alone does not establish a threat of monopoly.

With respect to the second and third factors—strength of competition and probable development of the market–Defendants assert that "Dicar has substantial market power in the relevant market, including the power to exclude competitors, control pricing, and limit output."  Am. Counterclaim ¶ 15.[12]  They contend that "[t]he relevant [U.S.] market is highly concentrated[; as u]pon information and belief, three companies—Dicar, Inc., Day Incorporated, and Custom Urethane Elastomers—account for more than 90% of the commerce in the relevant market, while Stafford accounts for less than 10% of the commerce in the relevant market."  Id. ¶ 17.[13]  Day, Inc. and Custom Urethane Elastomers each control between 15% and 20% of the U.S. market for rotary die-cutter blankets.  Id. ¶ 21.  These facts alone, however, do not indicate that there is a lack of competition in the U.S. market.   Moreover, these market share figures do not account for the numerous other entities that compete in the international market, such as Astan and Max Dura.  Id. ¶ 25.  Although market share is significant, as the Third Circuit explained, a plaintiff must show

[12] Plaintiffs assert that "Dicar's claimed exclusive licenses under Robud's patents enhance Dicar's market power while also raising barriers to entry in the relevant market."  Id. ¶ 16.

[13] Robud and Dicar acknowledge that Dicar controls more than 50% of the market for die-cutter blankets.  Id. ¶ 19.

"that there was [some] significant reduction in the number of manufacturers in the market during the relevant time period because of [plaintiffs'] allegedly anti-competitive conduct," for instance, by showing that a competitor was forced out of the market or that prices fluctuated. See Barr Labs., 978 F.2d at 114; U.S. v. Empire Gas Corp., 537 F.2d 296, 305 (8th Cir. 1976) (finding no dangerous probability of success in absence of evidence that competitors decided not to enter or leave market because of defendant's actions).[14]

With respect to barriers to market entry, the fourth Bars Labs factor, as noted above, Defendants have not made any specific assertions that could suffice to demonstrate that there are barriers to entry into the U.S. market. The Court is particularly reluctant to accept the pleading as sufficient where, as here, it appears that a foreign distributor (Max Dura) has in fact established a small presence in the U.S. market. As such, the Court finds that Defendants' assertions are not enough to show that Plaintiffs "effectively barricaded entry into the market." See St. Clair v. Citizens Fin. Group, 2009 U.S. App. LEXIS 16465, *8-9 (3d Cir. July 23, 2009).

As to the fifth factor, the nature of the anticompetitive conduct, Defendants contend that Plaintiffs are asserting their patent rights in bad faith. The only assertion regarding such conduct is that Robud and Dicar have an exclusive license arrangement with each other, and that there are previous and present court actions regarding Robud's patents. This Court previously determined that these statements were insufficient to plead the "barrier to entry" Barr Lab factor. See Dicar, 2009

_____

[14] The only allegation indicating that any market player was restricted or removed from the market is Defendants' contention that "[upon] information and belief, when Alan Kirkpatrick, Jr. developed a diecutter blanket to compete with Dicar, Dicar initiated a lawsuit against Mr. Kirkpatrick[; and o]n information and belief, although Mr. Kirkpatrick prevailed in that lawsuit, the resulting litigation expenses made it impossible for him to continue to develop and market his blanket." Id. ¶ 24.

-24-

U.S. Dist. LEXIS 52245, at *22-23 (citing Ethyl Gas Corp. v. U.S., 309 U.S. 436, 456 (1940)).

Lastly, as to the elasticity of consumer demand, Defendants assert that "there is practically no elasticity of consumer demand, as there is no substitute for the diecutter blankets." This allegation is conclusory, and in any case, the pleadings themselves indicate that there are other sources for the die cutter blankets. See Am. Counterclaim ¶ 12 (noting that Day, Inc. and Custom Urethane Elastomers each control between 15% and 20% of the U.S. market for rotary die-cutter blankets.).

In summary, Defendants have not adequately alleged facts suggesting that there is a dangerous probability that Plaintiffs will achieve a monopoly. Therefore, Plaintiffs' motion to dismiss Defendants' antitrust counterclaims is granted.

## IV.   PLAINTIFFS' MOTION FOR RECONSIDERATION OF THIS COURT'S DISMISSAL OF THEIR MOTION TO DISMISS DEFENDANTS' SECOND AND THIRD AFFIRMATIVE DEFENSES AND FIRST COUNTERCLAIM

Plaintiffs previously moved to dismiss Defendants' First Counterclaim and Second and Third Affirmative Defenses (all based upon inequitable conduct), for failure to state a claim. This motion was denied on June 22, 2009. See Dicar, 2009 U.S. Dist. LEXIS 52245, at *21-22, and Plaintiff requests reconsideration of this decision.

### A. STANDARD OF REVIEW

Motions for reconsideration are governed by L. Civ. R. 7.1(i). See U.S. v. Compaction Sys. Corp., 88 F. Supp. 2d 339, 345 (D.N.J. 1999). A motion pursuant to Local Rule 7.1(i) may be granted if (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. Database Am., Inc. v. Bellsouth Adver. & Pub. Corp., 825 F. Supp. 1216, 1220

(D.N.J. 1993).  Such relief is "an extraordinary remedy" that is to be granted "very sparingly."  See

NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996).

### B.  APPLICABLE LAW

To state a claim of inequitable conduct, a party must allege that the patent applicant: (1) made

an affirmative misrepresentation of material fact, failed to disclose material information, or

submitted false information and (2) intended to deceive the PTO.  Cargill, Inc. v. Canbra Foods, Ltd.,

476 F.3d 1359, 1363 (Fed. Cir. 2007).  Rule 9(b) requires that a pleading set forth: (1) who made the

misrepresentation to whom and the general content of the misrepresentation and (2) either the date,

place, or time of the misrepresentation or other measure of substantiation of the allegations.  Lum

v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004).

### C.  ANALYSIS

Defendants assert that '212 patent is void or unenforceable by reason of Robud's inequitable

conduct before the PTO.  Defendants allegations consist of the following:

> Robud, through its attorneys, employees, and agents, intentionally misrepresented the
> invention to the examiner in that on April 25, 1997, Robud amended claim 18 of the
> application to call for a separate locking member and compressible means for its
> invention.  Robud's amendment was made in response to the examiner's April 15,
> 1997 rejection of that claim because the claim previously called for a locking member
> "including" a compressible means.  **After Robud amended the claim to call for a
> separate locking member and compressible means, the examiner allowed the
> claim**.  **Now, after the patent has issued, Robud . . . states that the locking
> member and compressible means are not necessarily separate**.

Am. Complaint, at 5 (emphasis added).  Defendants, then, assert that statements made in connection

with Plaintiffs' claim construction argument illustrate that Robud (the patent applicant) made false

statements to the PTO.  Specifically, they argue that Robud initially indicated to the examiner that

the "locking member" and "compressible means" were separate, and now are asserting that the two

components need not be separate.

The Court must reject Defendants' contentions for two reasons.  First, the Court disagrees with Defendants' characterization of the applicants' statements before the PTO.  As discussed above, the applicants did not assert that the "locking member" and "compressible means" must be separate components—just that they could be.  See Section II, supra (finding that the "locking member" and "compressible means" could be **either** separate elements that are part of the same structure **or** two separate structures attached after individual manufacture).[15]  Accordingly, the positions taken before the PTO and this Court are not necessarily inconsistent.

Second, and more importantly, even if the Court were to find that the two statements are inconsistent, Defendants' claim must still fail.  Defendants have not alleged that the patent applicant breached its duty of candor to the PTO "by failing to disclose material information, or submitting false material information."  Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988).  Instead, the only allegation of misconduct is premised entirely on attorney arguments—i.e., arguments regarding the meaning of proposed patent claims during prosecution, and arguments relating to claim construction after the patent was granted.  Such statements, even if inconsistent, do not constitute inequitable conduct, as it is "clear that an applicant is free to advocate its interpretation of its claims and the teachings of prior art."  Innogenetics N.V. v. Abbott

_____

[15] The Court will not repeat the analysis above, however, to summarize: the patent applicants initially claimed a locking member wherein "said [locking] member **includ[ed]** compressible means for compressive interference engagement with said channel."  After rejection for lack of clarity, the applicants claimed "compressible means **coupled** to the locking member."  Defendants assert that this was a statement by the applicants that the locking member/compressible means were initially one unit, and then the applicant modified their claims to indicate that the two elements are separate structural units.  The Court disagreed and determined that under these circumstances, the locking member and compressible means do not have to be two structurally distinct units to be "coupled" to each other.  See Section II, supra

-27-

Laboratories, 512 F.3d 1363, 1379 (Fed. Cir. 2008); see Rothman v. Target Corp., 556 F.3d 1310, 1329 (Fed. Cir. 2009).

      For the reasons discussed, Plaintiffs' motion for reconsideration is granted.

## V.    <u>CONCLUSION</u>

      For the reasons stated, Plaintiffs' motion to dismiss Counts Two and Three of Defendants' Amended Counterclaims is **granted**;  Plaintiffs' motion for reconsideration is **granted**;  and the disputed term of claim 13 is construed as set forth above.


                       <u>S/ Dennis M. Cavanaugh</u>
                       Dennis M. Cavanaugh, U.S.D.J.

Date:         March  <u>12</u> , 2010
Original:     Clerk's Office
cc:            All Counsel of Record
               The Honorable Mark Falk, U.S.M.J.
               File